**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Joshua D. Bendor (Bar No. 031908)
Nathan T. Arrowsmith (Bar No. 031165)
Joshua A. Katz (Bar No. 039449)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Joshua.Bendor@azag.gov
Nathan.Arrowsmith@azag.gov
Joshua.Katz@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| State of Arizona, | No. _____ |
| --- | --- |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Markwayne Mullin, Secretary of Homeland Security, sued in his official capacity; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; and Todd Lyons, Acting Director of U.S. Immigration and Customs Enforcement, sued in his official capacity, | |
| Defendants. | |

**INTRODUCTION**

1. The State of Arizona brings this action seeking declaratory and injunctive relief to stop Defendants' unlawful decision to establish a massive immigration detention facility in an industrial warehouse in Surprise, Arizona.

2. On January 23, 2026, Defendants purchased a vacant industrial warehouse (the "Surprise Warehouse") in the City of Surprise, located in Maricopa County, Arizona, for approximately $70 million. Defendants intend to convert the Surprise Warehouse into an immigration detention center capable of holding between 500 and 1,500 detainees.[1]

3. In their rush to expand detention capacity across the country and implement a deportation system that operates "like [Amazon] Prime, but with human beings,"[2] Defendants have run roughshod over statutory requirements imposed by the Immigration and Nationality Act (INA); National Environmental Policy Act (NEPA); and Administrative Procedure Act (APA).

4. Defendants' plan, if allowed to occur, will undoubtedly have significant impacts on the surrounding environment. The Surprise Warehouse was constructed as an industrial distribution facility for up to four commercial tenants, not a space to house hundreds of human beings. Because Defendants have failed to conduct any

---

[1] Initial reports indicated that the Defendants intended to house 1,500 detainees at the Surprise Warehouse. Some recent reports indicate that Defendants intend to house up to 542 detainees there. *See, e.g.*, Tim Henderson, *ICE scales back Surprise Az detention warehouse plan from 1,500 beds to 542*, Tucson Sentinel (Apr. 18, 2026), https://www.tucsonsentinel.com/local/report/041826_surprise_ice_warehouse/ice-scales-back-surprise-az-detention-warehouse-plan-from-1500-beds-542 (last accessed Apr. 21, 2026). But as identified herein, the harms to the State from Defendants' actions arise from the extensive construction efforts required to render the Surprise Warehouse fit for human occupancy and the siting of the Surprise Warehouse in a patently inappropriate location. Those harms will be significant even if the Surprise Warehouse holds "only" hundreds of detainees.

[2] Jerod Macdonald-Evoy, *ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, but with Human Beings'*, Ariz. Mirror (Apr. 8, 2025), https://azmirror.com/2025/04/08/ice-director-envisions-amazon-like-mass-deportation-system-prime-but-with-human-beings (quoting Acting ICE Director Todd Lyons) (last accessed Apr. 1, 2026).

environmental analysis, the State has no idea how Defendants plan to modify the Surprise Warehouse for its new intended purpose.  As constructed, though, the Surprise Warehouse almost certainly does not have the appropriate water and wastewater infrastructure to safely (and humanely) house hundreds of people.  Not to mention the strain that hundreds of new, involuntary residents will place on Surprise's resources and infrastructure—water, sewage, roads, emergency services, etc.

5.    Retrofitting the Surprise Warehouse for Defendants' intended purposes would require extensive construction and renovation efforts, which will also have environmental impacts.  Underscoring the finality of their plan, Defendants have already issued contracts (to the tune of over $300 million) to supervise that work.

6.    Given the obvious impacts of Defendants' plan on the surrounding environment, Defendants were required under NEPA to either (1) compile an environmental impact statement; (2) conduct an environmental assessment (resulting in either a formal, public finding of no significant environmental impact or compilation of an environmental impact statement); or (3) identify a categorical exclusion.  Defendants did none of the above.

7.    Under the INA, Defendants are required to arrange for "appropriate" places for immigrant detention.  The Surprise Warehouse is not (and will never be) suitable for use as a mass detention facility, so Defendants' selection of the Surprise Warehouse to house human beings violates the INA.

8.    The Surprise Warehouse is located in an area zoned for industrial use.  In keeping with that zoning designation, it sits directly across the street from a chemical storage facility containing thousands of gallons of hazardous materials.  Defendants appear to have performed no analysis regarding the appropriateness of housing a captive population a stone's throw from a storage facility for hazardous chemicals.  The Surprise Warehouse is also located approximately one mile from a public high school and a public middle school.  The location of the Surprise Warehouse will increase traffic and negatively impact the municipality and State's ability to protect public health and provide

2

emergency services, particularly in the event of an accident involving the chemical storage warehouse located across the street.

9. Whatever the value of Defendants' intended reforms to the federal immigration system—a question the State does not address here—Defendants cannot simply ignore the statutory mandates imposed by NEPA, the INA, and the APA in pursuing their policy objectives. Because Defendants' actions violate NEPA and the INA, they violate the APA—not only are Defendants' actions arbitrary and capricious, but they are also contrary to law.

10. The Court should accordingly enjoin Defendants from operating the Surprise Warehouse as a mass detention center and enjoin Defendants from conducting construction and retrofitting efforts to accomplish the same.

**JURISDICTION AND VENUE**

11. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because the State of Arizona and its Attorney General reside in this District and a substantial part of the acts or omissions giving rise to this action occurred in this District.

**PARTIES**

13. Plaintiff State of Arizona is a sovereign state of the United States of America. Arizona is represented through its chief law enforcement officer, Attorney General Kris Mayes.

14. Defendant Markwayne Mullin is the Secretary of Homeland Security and head of the U.S. Department of Homeland Security. He is sued in his official capacity.

15. Defendant U.S. Department of Homeland Security is a department of the Executive Branch of the United States government. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

16. Defendant U.S. Immigration and Customs Enforcement is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is under the supervision of DHS.

17. Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

## BACKGROUND

## I. Legal Background

### A. NEPA establishes procedures for undertaking major agency actions.

18. Congress enacted the National Environmental Policy Act (NEPA) "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. In recognizing "the profound impact of man's activity on the interrelations of all components of the natural environment," and "the critical importance of . . . maintaining environmental quality to the overall welfare and development of man," Congress declared "that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures" to accomplish NEPA's goals. *Id*. § 4331(a).

19. NEPA's mission is twofold: first, "to generate federal attention to environmental concerns," and second, "to reveal that federal consideration for public scrutiny." *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (quotation omitted), *opinion amended on denial of reh'g*, 282 F.3d 1055 (9th Cir. 2002).

20. To accomplish those goals, NEPA requires that agencies follow one of three pathways for compliance: preparation of an environmental impact statement (EIS), preparation of an environmental assessment (EA) (resulting in either a finding of no significant impact or preparation of an EIS), or invocation of an applicable categorical exclusion.

### 1. Preparation of an environmental impact statement.

21. When an agency undertakes a "major Federal action[ that will] significantly affect[] the quality of the human environment," NEPA requires the agency to prepare a detailed environmental impact statement (EIS). 42 U.S.C. § 4332(C).

22.    "The EIS is 'a procedural obligation designed to assure that agencies give proper consideration to the environmental consequences of their actions.'" *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 666 (9th Cir. 1998) (quoting *Merrell v. Thomas*, 807 F.2d 776, 777–78 (9th Cir. 1986)).  "The point [of an EIS] . . . is not merely that an agency produce a report but 'that environmental concerns be integrated into the very process of agency decision-making.'" *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 197–98 (2025) (Sotomayor, J., concurring) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979)).

23.    NEPA defines a "major Federal action" as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility."  42 U.S.C. § 4336e(10)(A).

24.    An agency preparing an EIS must consider numerous factors, including "any reasonably foreseeable environmental effects of the proposed agency action"; "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented"; "a reasonable range of alternatives to the proposed agency action"; and "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity."  *Id*. § 4332(C).

### 2.    Preparation of an environmental assessment.

25.    If it is not clear whether the "major Federal action" will cause "reasonably foreseeable significant [environmental] effect[s]," then the agency "*shall* prepare" an environmental assessment (EA).  42 U.S.C. § 4336(b)(2) (emphasis added).  An EA is a "concise public document" resulting in one of two outcomes: a finding of no significant impact (FONSI) or preparation of an EIS.  *Id*.

26.    If the EA concludes that the major Federal action will not result in reasonably foreseeable significant environmental effects, then the agency must issue a FONSI setting out the basis for its conclusions.  *Id*.

27. Alternatively, if the EA concludes that the major Federal action *will* result in reasonably foreseeable significant environmental effects, then the agency must complete an EIS. *Id*.

### 3. Invocation of an appropriate categorical exclusion.

28. An agency is excused from preparing an EA or EIS only if it invokes an appropriate categorical exclusion. Categorical exclusions apply only to actions that the agency "has determined normally does not significantly affect the quality of the human environment within the meaning of [42 U.S.C. §] 4332(2)(C)." 42 U.S.C. § 4336e(1).

29. DHS's policies preclude application of a categorical exclusion where an action "would have significant environmental impacts," "presents the potential for significant environmental impacts," or where "that potential cannot be readily determined."[3]

\*\*\*

30. NEPA "requires the federal government to 'take a hard look at the environmental consequences' *before* acting." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir. 2025) (emphasis added) (quoting *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006)).

31. The DHS Instruction Manual states that "[o]pen communication, consistent with other Federal requirements, is DHS policy." DHS Instruction Manual at IV-6. Such collaboration, DHS recognizes, "improve[s] the effectiveness of DHS missions and activities," and "build[s] trust between DHS and the communities it serves." *Id*.

32. In addition, DHS has identified that "[c]ollaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making," and that "[p]ublic involvement starts

---

[3] *See* Dep't of Homeland Sec., Instruction Manual 023-01-001-01, Revision 01, *Implementation of the National Environmental Policy Act (NEPA)* at V-5 (Nov. 6, 2014), https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf (last accessed Apr. 14, 2026) (hereinafter DHS Instruction Manual).

early and continues throughout the NEPA process." *Id*.

33.    The DHS Instruction Manual further specifies that "collaboration and public involvement in NEPA activities include the following three key elements: (1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments." *Id*. at IV-6–7.

**B.    The INA authorizes the construction of new detention facilities only in "appropriate" locations.**

34.    The Immigration and Nationality Act (INA) requires that DHS "arrange for appropriate places of [immigrant] detention." 8 U.S.C. § 1231(g)(1).

35.    The INA does not define "appropriate." But the plain meaning of that word is "especially suitable or compatible." *Appropriate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/appropriate (last accessed Apr. 1, 2026).

36.    Under ICE's detention standards, facilities are appropriate when they possess "appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards."[4] Facilities must also provide "reasonably private bathing and toileting environment[s] in accordance with safety and security needs."[5]

37.    The INA also establishes that "[p]rior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing *prison, jail, detention center,*

---

[4] *See* Dep't of Homeland Sec., Immigr. & Customs Enf't, National Detention Standards at 7 (rev. 2025) (hereinafter ICE National Detention Standards), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf (last accessed Apr. 13, 2026).

[5] *Id*. at 128.

*or other comparable facility* suitable for such use."[6]  8 U.S.C. § 1231(g)(2) (emphasis added).

**C.    The Administrative Procedure Act forbids agency actions that are arbitrary, capricious, or contrary to law.**

38.    "The APA 'sets forth the procedures by which federal agencies are accountable to the public.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).  It "requires agencies to engage in 'reasoned decisionmaking,'" *id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)), and mandates that agency actions be set aside if they are "arbitrary," "capricious," or "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

39.    Reasoned decision-making requires an agency to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  An agency fails to meet this standard if it "fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it [can]not be ascribed to a difference in view or the product of agency expertise." *Id.*

40.    Failure to engage in reasoned decision-making runs afoul of the APA's prohibition against agency actions that are "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2).

41.    When an agency breaks with a prior policy or decision, "the requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display awareness that it *is* changing position.  An agency may not, for example, depart

---

[6]  Although 8 U.S.C. § 1231(g)(2) refers to duties on the part of the "Commissioner" of Immigration and Naturalization, those duties were transferred to DHS in the Homeland Security Act of 2002.  Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(3), 116 Stat. 2135, 2178 (2002).

from a prior policy *sub silentio* or simply disregard rules that are still on the books.  And of course the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citations omitted).

42.    Lastly, an agency's actions are subject to review under the APA only when they are "final."    5 U.S.C. § 704.    Finality occurs when the action reflects a "consummation of the agency's decisionmaking process" and is one "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

## II.    Factual Background

### A.    ICE adopts a new policy for expanding mass immigration detention through ICE-owned human warehouses.

43.    ICE has historically avoided operating its own detention places for numerous reasons, including the increased costs of operating such facilities—as compared to working with contractor-run facilities or local jails—and the typically extensive timelines required for their design and construction.[7]

44.    In both Eloy and Florence, Arizona, for example, ICE has contracted with private operators to utilize *purpose-built* facilities for immigration detention.[8]

45.    On the rare occasions DHS has attempted to construct or modify a detention facility, it has complied with NEPA.  For example, in 2021, DHS completed an EA before advancing plans to construct a detention processing center in El Paso,

---

[7] *See* U.S. Gov't Accountability Off., GAO-21-149, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* at 13 (Jan. 2021), https://www.gao.gov/assets/gao-21-149.pdf (last accessed Apr. 14, 2026).

[8] *See* Florence Immigr. & Refugee Rts. Proj., *Anthology of Abuse: A Legacy of Failed Oversight and Death at the Eloy Detention Center*, Detention Watch Network (Oct. 2024), https://www.detentionwatchnetwork.org/reports/2024/anthology-abuse-eloy (last accessed Apr. 22, 2026); Off. of Detention Oversight Compliance Insp., Dep't of Homeland Sec., U.S. Immigr. & Customs Enf't, *Enforcement and Removal Operations, ERO Phoenix Field Office, Florence Correctional Center, Florence, AZ* at 2 (June 2016), https://embed.documentcloud.org/documents/3116128-2016-ODO-Inspection-Florence-Correctional-Center (last accessed Apr. 22, 2026).

Texas. The final EA discussed several opportunities for public involvement including letters and a draft EA sent to 23 stakeholders.[9]

46. But under the current federal administration, ICE has extensively revised its strategies for operating detention facilities. Speaking at a "Border Security Expo" in Phoenix, Arizona, in April 2025, Acting ICE Director Todd Lyons explained that ICE would begin "treating [deportation] like a business," altering its deportation practices to function "like [Amazon] Prime, but with human beings."[10]

47. In July 2025, Congress appropriated $45 billion to ICE for "single adult alien detention capacity and family residential center capacity," to remain available for obligation through September 2029. Pub. L. 119-21 § 90003, 139 Stat. 72, 358 (July 4, 2025).

48. DHS immediately began working to expand ICE's detention capacity across the United States to "meet the growing demand for bedspace and streamline the detention and removal process," an effort that DHS has named the "ICE Detention Reengineering Initiative" (DRI).[11]

49. A key component of the DRI is its focus on utilizing "non-traditional facilities built specifically to support ICE's needs." Thus, among other efforts, ICE plans to acquire and renovate "eight large-scale detention centers and 16 processing sites." ICE will also purchase 10 existing "turnkey" facilities, which are privately owned jails and

---

[9] *See* Dep't of Homeland Sec., Immigr. & Customs Enf't, *Final Environmental Assessment for El Paso, Texas Service Processing Center* at 6 (Sept. 15, 2021), https://www.dhs.gov/sites/default/files/publications/ice_el_paso_spc_final_ea_9-27-2021_508compliant.pdf (last accessed Apr. 14, 2026).

[10] *See* Macdonald-Evoy, *supra* n.2.

[11] Dep't of Homeland Sec., Immigr. & Customs Enf't, *ICE Detention Reengineering Initiative* at 1 (Feb. 13, 2026), https://www.governor.nh.gov/sites/g/files/ehbemt971/files/media/media_document/merrimack-nh-detention-reengineering-initiative-final.pdf (last accessed Apr. 14, 2026) (hereinafter DRI White Paper).

10

prisons that currently contract with ICE to hold immigration detainees.  ICE plans to spend $38.3 billion to "fully implement" the DRI by September 30, 2026.[12]

50.    Upon information and belief, ICE has to date spent over $700 million to purchase nine warehouses that it intends to use as three large-scale detention facilities with planned capacity for 7,500-10,000 people and six "processing sites" with intended capacity for up to 1,500 people.  One of those recently acquired processing sites is the Surprise Warehouse.

**B.    ICE purchases the Surprise Warehouse.**

51.    On January 22, 2026, DHS sent a letter to the Arizona State Historic Preservation Office purporting to "initiate consultation on a proposed [DHS and ICE] undertaking subject to Section 106 of the National Historic Preservation Act (NHPA) in Surprise, Arizona."  *See* Exhibit A (NHPA Notice).

52.    The NHPA Notice indicated that ICE was "proposing to purchase, occupy and rehabilitate a 24.46-acre warehouse property in support of ICE operations" and had "determined that the undertaking will result in a finding of No Historic Properties Affected."  *Id*. at 2.

53.    The NHPA Notice asked the Arizona State Historic Preservation Office to "provide any comments on the undertaking and ICE's finding within 30 calendar days of the date of receipt of this letter."  *Id*. at 3.  The Arizona State Historic Preservation Office received the NHPA Notice on January 26, 2026.

54.    On January 23, 2026, one day after initiating NHPA consultation with Arizona and before the Arizona State Historic Preservation Office had even received the NHPA Notice, ICE purchased the Surprise Warehouse for $70,035,000.00.  *See* Exhibit B.  DHS did not consult with or notify the City of Surprise before moving forward with the purchase.[13]

---

[12] *Id*.

[13] At the first Surprise City Council meeting following announcement of the Surprise Warehouse purchase, Surprise residents spoke for nearly five hours—pushing the 7 p.m. meeting until midnight—in virtually uniform opposition to Defendants' plans.

55. The Surprise Warehouse is located on a 24-acre parcel at 13290 W. Sweetwater Avenue in Surprise, Arizona. The building itself is a spec-built, 418,400 square foot industrial "distribution facility" that was marketed for lease to up to four tenants.[14] The Surprise Warehouse was not designed or constructed to house, feed, bathe, protect, or provide adequate care for humans.

56. The Surprise Warehouse is located approximately one mile from both Dysart High School (which enrolls approximately 1,400 students) and Dysart Middle School (which enrolls approximately 600 students).

57. At 13255 W. Sweetwater Ave., Surprise, Arizona—directly across the street from the Surprise Warehouse—Rinchem Co., LLC, operates a 123,000 square foot hazardous materials storage warehouse (the Chemical Warehouse) which includes more than 100,000 feet of containerized hazardous materials storage for chemicals used in semiconductor production.[15]

---

[14] See 13290 W Sweetwater Ave Surprise, AZ 85379, Surprise Pointe Commerce Center, Property For Lease, LoopNet (Aug. 2023), https://www.loopnet.com/Listing/13290-W-Sweetwater-Ave-Surprise-AZ/29187738/ (last accessed Apr. 14, 2026).

[15] See Rinchem, Rinchem Opens Massive Custom Chemical Warehouse in Surprise, Arizona to Support Semiconductor Giant, PR Newswire (Feb. 27, 2024), https://www.prnewswire.com/news-releases/rinchem-opens-massive-custom-chemical-warehouse-in-surprise-arizona-to-support-semiconductor-giant-302071977.html?tc=eml_cleartime (last accessed Apr. 14, 2026).

58. After the purchase but sometime prior to February 18, 2026, ICE issued an "Early Notice and Public Review of a Proposed Activity in a 100- to 500- Year Floodplain." *See* Exhibit C (Floodplain Notice).

59. According to the Floodplain Notice, ICE plans to "acquire, renovate, and occupy" the Surprise Warehouse "for use as a temporary detainee dormitory for individuals awaiting immigration proceedings."

60. The Floodplain Notice identifies many planned modifications that ICE "may" undertake at the Surprise Warehouse, including "interior renovations, upgrades to parking, utilities, and stormwater, installation of upgraded perimeter fencing, construction of outdoor recreation spaces on existing paved surfaces, and construction of a guard shack." *Id*.

61. DHS claims that "[p]otable water and sanitary sewer service are already sized for industrial-scale operations" and that "[p]reliminary engineering review indicates that the existing sanitary sewer lateral is expected to have sufficient capacity to support the proposed operational use." *Id*.

13

62.    The Floodplain Notice asserts that DHS considered, in addition to taking no action, purchasing four other potential locations within Arizona. *Id*. DHS ultimately concluded that the Surprise Warehouse was the "Preferred Alternative" because the Surprise Warehouse (1) is new construction "requiring only limited interior modifications and minor exterior improvements"; (2) is "located in an established industrial area with compatible surrounding land uses"; (3) "includes existing utility, stormwater and transportation infrastructure"; and (4) is proximate to ICE's "Area of Responsibility." *Id*.

63.    All of the other potential locations DHS considered as alternatives are—like the Surprise Warehouse—industrial warehouses not designed or suitable for mass detention.

64.    While providing no specifics, DHS purports to have evaluated these alternative locations in accordance with NEPA. *Id*.

65.    The Floodplain Notice invited public comment, but DHS gave conflicting information regarding the deadline for submitting public comment. In the Floodplain Notice, DHS stated that the deadline for public comment was January 19, 2026 (four days *before* DHS's purchase of the Surprise Warehouse). *Id*. However, the section of DHS's website which pertains to "Documents for Public Comment" previously stated that the deadline for comment was February 20, 2026:

## Other Documents for Public Review

DHS invites public comment on the Early Notice and Public Review of a Proposed Activity in a 100-to 500- year Floodplain - Surprise, AZ. Comments must be submitted to ✉ icesustainability@ice.dhs.gov by Friday, February 20, 2026.

Please also check the CBP, FEMA, USCG, and FLETC environmental websites for additional documents.

66.    On February 20, 2026, before one of the stated deadlines for public comment had expired, DHS removed the Floodplain Notice regarding the Surprise Warehouse and replaced it with a similar Notice for a warehouse facility in Michigan:

**Other Documents for Public Review**

DHS invites public comment on the Early Notice and Public Review of a Proposed Activity in a 100-to 500- year Floodplain - Romulus, MIZ. Comments must be submitted to ✉ icesustainability@ice.dhs.gov by Friday, February 27, 2026.

Please also check the CBP, FEMA, USCG, and FLETC environmental websites for additional documents.

67.     Aside from the NHPA Notice and a singular reference to NEPA in the Floodplain Notice, Plaintiff is not aware of any other notice or consultation that Defendants have provided to meet their legal obligations under NEPA and the APA with respect to the acquisition of the Surprise Warehouse.  This includes through the invocation of an applicable categorical exclusion.

**C.      Defendants have failed to provide adequate responses to requests for information regarding the Surprise Warehouse.**

68.     Upon learning of Defendants' acquisition of the Surprise Warehouse, various members of Arizona's congressional delegation and Attorney General Mayes sent letters to Defendants asking for information regarding Defendants' plans for the Warehouse and the steps Defendants had taken to comply with the law.

69.     On February 4, 2026, Representative Paul Gosar sent then-DHS Secretary Kristi Noem a letter asking for information regarding Defendants' plans for and prior communications regarding the Surprise Warehouse.  Therein, Representative Gosar observed that "[a] detention facility of the reported size raises legitimate and reasonable questions for nearby residents, schools, first responders, and local governments" including "[c]oncerns regarding infrastructure capacity, traffic, emergency services, environmental impacts, and public safety[.]"  Exhibit D.

70.     One day later, Representatives Greg Stanton, Yassamin Ansari, and Adelita Grijalva sent a letter to then-Secretary Noem and Acting Director Lyons that sought answers to ten questions regarding the Surprise Warehouse, including a request that Defendants identify the NEPA pathway used for the Surprise Warehouse acquisition,

namely "whether DHS prepared an environmental assessment or environmental impact statement, or relied on a categorical exclusion." Exhibit E.

71. On February 9, Attorney General Mayes sent a letter to then-Secretary Noem asking for, among other requests, details regarding traffic, noise, outdoor lighting, anticipated water usage, plans for liquid and solid waste disposal," and other impacts to local services and neighboring residents, schools, and businesses. Exhibit F.

72. Attorney General Mayes requested a response by February 17, but has received no response to date.

73. Representatives Stanton, Ansari, and Grijalva requested a response by February 20, but, upon information and belief, have not received any response to date.

74. The only letter to which Defendants responded was Representative Gosar's letter. In her February 18 response to Representative Gosar, then-Secretary Noem confirmed that "ICE and the contractor performing due diligence services did not have direct contact with the city of Surprise or Maricopa County prior to site selection"; and that ICE did not complete a "site and engineering evaluation" of any necessary improvements to the infrastructure servicing the Surprise Warehouse prior to acquisition. Exhibit G.

**D. Converting the Surprise Warehouse for use as a mass detention center will require extensive construction and renovation efforts.**

75. To convert the Surprise Warehouse into a detention facility for hundreds of detainees (to say nothing of hundreds of ICE staff and visitors), Defendants will need to conduct extensive design, planning, and, ultimately, construction efforts that will substantially change the character, purpose, function, and environs of the warehouse.

76. Upon information and belief, the Surprise Warehouse is currently comprised of a single large room with concrete floors and a minimal amount of office space. It was designed for a standard industrial setting with low demand for the use of water.

77.    DHS has acknowledged that interior and exterior improvements "may" be necessary to convert the Surprise Warehouse from an industrial warehouse to an immigration detention facility.

78.    These include "construction of holding and processing spaces, office space, public-facing visitor spaces, and installation of amenities, such as cafeterias, bathrooms, and health care spaces," NHPA Notice (Ex. B) at 2, as well as "interior renovations, upgrades to parking, utilities, and stormwater, installation of upgraded perimeter fencing, construction of outdoor recreation spaces on existing paved surfaces, and construction of a guard shack," Floodplain Notice (Ex. C).

79.    There is no question that such retrofitting efforts will *need* to take place. Upon information and belief, the warehouse does not currently contain adequate facilities to support a full-time presence of hundreds of full-time detainees and staff.

80.    The Surprise Warehouse will require adequate plumbing fixtures, to include showers, toilets, wash basins, and laundry facilities.  Assuming the facility will hold up to 1,500 detainees, as initially projected by ICE, and even assuming, conservatively, that all those detainees are male (given that the number of fixtures required per male detainee is lower than the number of fixtures required per female detainee), the facility would be required under ICE's own standards to have at least 125 showers, 125 toilets, and 125 wash basins for use by detainees.[16]  Even if that number drops to 500 detainees, the facility will require dozens of showers, toilets, and wash basins.  This is to say nothing of the additional facilities required to support the constant churn of supervisory staff and invitees such as visitors and lawyers.

---

[16] *See* Dep't of Homeland Sec., Immigr. & Customs Enf't, *Performance-Based National Detention Standards* at 329 (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (last accessed Apr. 14, 2026) (hereinafter Performance-Based National Detention Standards) (identifying the need for one shower, toilet, and wash basin per every 12 male detainees).
    The Performance-Based National Detention Standards are distinct from the National Detention Standards.

81. Bringing the Surprise Warehouse in line with ICE's own standards will thus require a significant increase from the facility's current number of showers, toilets, and wash basins. Such a change would necessitate extensive design, planning, and construction efforts.

82. ICE's National Detention Standards also specifically require Defendants to construct a "secure perimeter" equipped with a "sally port," "reasonably private bathing and toileting environment[s]," and an "emergency electrical power generator." *See* ICE National Detention Standards at 5, 25, 128.

83. Upon information and belief, the Surprise Warehouse currently possesses none of these features. Building them will thus require additional construction.

84. ICE's National Detention Standards also require Defendants to ensure that "[p]otable water [is] available throughout the facility," and that "[e]nvironmental health conditions will be maintained at a level that meets recognized standards of hygiene," including those set by "the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the National Fire Protection Association . . . and the Centers for Disease Control and Prevention (CDC)." *Id*. at 5–6.

85. The National Detention Standards also provide that detention facilities "shall ensure appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards." *Id*. at 7.

86. Upon information and belief, the Surprise Warehouse is not currently capable of functioning in accordance with those requirements. And ensuring that the Surprise Warehouse satisfies those requirements will require further—extensive—construction efforts.

87. Given the substantial increase in occupancy of the Surprise Warehouse under Defendants' plans, construction will also likely be necessary to ensure that the

facility has appropriate means of ingress and egress for emergency vehicles and other vehicular traffic.

88.    Defendants' actions since purchasing the Surprise Warehouse confirm the necessity and extensive scale of the design, planning, construction, and retrofitting efforts required to convert the facility for use as a mass detention center.  Namely, on March 6, 2026, Defendants contracted with GardaWorld Federal Services, LLC, to retrofit and operate the Surprise Warehouse at a cost of approximately $313 million.[17] *See* Exhibit H.  That contract authorizes a potential award of up to $704 million.

89.    Defendants have also conducted an economic analysis that predicts construction efforts will require hiring nearly 1,400 workers.[18]

**E.    Converting the Surprise Warehouse into a mass detention facility harms the State and triggers Defendants' obligations under NEPA.**

90.    By any standard, a $300 million renovation contract requiring over one thousand construction workers to complete constitutes a "major Federal action," triggering Defendants' obligations to comply with NEPA.

91.    Despite Defendants' virtual failure to provide any information regarding their plans for the Surprise Warehouse, the State has identified a number of harms which NEPA is designed to prevent and which Defendants have failed to consider.

---

[17] GardaWorld has never undertaken this kind of facility conversion work before. It is perhaps best known for providing staffing for so-called "Alligator Alcatraz," an immigration detention facility in Florida that Amnesty International has called a "human rights disaster."  *See USA: New Findings Reveal Human Rights Violations at Florida's "Alligator Alcatraz" and Krome Detention Centers*, Amnesty Int'l (Dec. 4, 2025), https://www.amnesty.org/en/latest/news/2025/12/estados-unidos-nuevas-investigaciones-revelan-violaciones-de-derechos-humanos-en-los-centros-de-detencion-de-alligator-alcatraz-y-krome-en-florida (last accessed Apr. 14, 2026).

[18] *See* Dep't of Homeland Sec., Immigr. & Customs Enf't, *Surprise, AZ Processing Site—Economic Impact Analysis* (Feb. 2026), https://npr.brightspotcdn.com/d4/3d/3843693e4ab4a8654dd21458115b/surprise-economic-impact.pdf (last accessed Apr. 14, 2026) (hereinafter Surprise Warehouse Economic Analysis).

92.    Arizona is a desert state with a plethora of sensitive environmental concerns including issues relating to water management and air quality control. Among other impacts, conversion of the warehouse is likely to strain valuable surface water and groundwater resources through significantly increasing both the water usage and wastewater creation of the Surprise Warehouse from its original footprint. Conversion of the warehouse is also likely to significantly increase air emissions.

93.    Any attempt to convert the Surprise Warehouse in line with Defendants' intentions accordingly poses substantial risks to the surrounding environment.

1.    **Conversion of the Surprise Warehouse will increase the strain on local sewer systems.**

94.    Defendants' plans for the Surprise Warehouse create a serious risk of overwhelming local wastewater systems.

95.    If the Surprise Warehouse were converted into a detention facility housing between 500 and 1,500 detainees, its projected wastewater output from detainees alone would be between 35,000 and 104,000 gallons per day.[19] Upon information and belief, this is significantly greater than the currently planned and anticipated wastewater usage of the Surprise Warehouse.

96.    The City of Surprise's existing conveyance system may have insufficient capacity to convey the additional anticipated flow from the Surprise Warehouse.

97.    Wastewater flow from the Surprise Warehouse that exceeds the capacity of the existing infrastructure poses serious risks of damage to the sewer system and sewage overflows into the Surprise Warehouse itself, as well as potential overflows onto nearby land and neighboring properties.

---

[19] *See* Env't Protection Agency, *Onsite Wastewater Treatment Systems Manual* at 3-3 (Feb. 2002), https://www.epa.gov/sites/default/files/2015-06/documents/2004_07_07_septics_septic_2002_osdm_all.pdf (last accessed Apr. 14, 2026) (calculating the average wastewater output of an individual at approximately 69 gallons per day).

98.    DHS also cannot simply avoid modifying sewage use by trucking wastewater out, as that shortcut would render the warehouse unfit for human occupancy under both the City of Surprise and DHS's own policies and procedures.  *See* Performance-Based National Detention Standards at 329; International Building Code § 2902.1 (2024).[20]

**2.    Conversion of the Surprise Warehouse will increase the strain on local water systems.**

99.    Converting the Surprise Warehouse into a detention facility housing hundreds of detainees at a time will also greatly increase the strain on the City of Surprise's water systems.

100.    Upon information and belief, the Surprise Warehouse is currently capable of providing water for limited use by four commercial tenants during normal business hours.

101.    Were the Surprise Warehouse to house between 500 and 1,500 detainees, the facility's water demand would balloon to between 40,000 and 123,000 gallons per day for the detainee population alone.[21]  Upon information and belief, this is significantly greater than the currently planned water usage for the Surprise Warehouse.

102.    If Defendants convert the Surprise Warehouse into a detention facility housing hundreds of people and draw on the existing system to provide water for that facility, they will drastically increase the strain on the City of Surprise's water system.

103.    Increasing the Surprise Warehouse's water usage in this manner poses a substantial risk of exceeding the available allocation or system capacity, which could in turn reduce water pressure and reliability for other users, impair flows needed for

---

[20] The City of Surprise has adopted the International Building Code.
[21] *See* Env't Protection Agency, *Statistics and Facts* (Mar. 11, 2026), https://www.epa.gov/watersense/statistics-and-facts (last accessed Apr. 14, 2026) (calculating the average daily usage of water for an individual at 82 gallons).

21

suppressing fires, accelerate the depletion of underground water aquifers, diminish nearby wells, and alter groundwater flow in ways that reduce water quantity.

### 3. Construction and operation of the Surprise Warehouse will detrimentally impact air quality.

104. The State has a well-established interest in maintaining air quality. *See* A.R.S. § 49-401. Converting the Surprise Warehouse to a detention facility and operating it as such will necessarily increase air emissions.

105. These problems are exacerbated if additional boilers, emergency generating units, or similar emitting equipment are required. As DHS's own National Detention Standards require an "emergency electrical power generator," some increase in air emissions is effectively certain. *See* ICE National Detention Standards at 5.

106. DHS expects to employ approximately 1,400 people during construction and nearly 500 staff at the Surprise Warehouse following its conversion.[22] The increased traffic in the area from the establishment of a mass detention facility would increase local air emissions as well. For instance, the Environmental Protection Agency has recognized that vehicles emit nitrogen oxide, a precursor to ground-level ozone.[23] Ozone is a pollutant for which the EPA sets National Ambient Air Quality Standards due to its negative health impacts. These include causing difficulty breathing, increasing asthma attacks, and aggravating respiratory diseases.[24]

\*\*\*

107. Each of these interests should have been considered by Defendants in an appropriate NEPA document *before* taking steps to acquire and convert the Surprise Warehouse into an immigration detention facility.

---

[22] *See* Surprise Warehouse Economic Analysis.

[23] *See* Env't Protection Agency, *Basic Information about NO2* (July 10, 2025), https://www.epa.gov/no2-pollution/basic-information-about-no2 (last accessed Apr. 14, 2026).

[24] *Id.*

**F.      The Surprise Warehouse location will never be an appropriate site for a mass detention facility under the INA.**

**1.      The Surprise Warehouse's proximity to the Chemical Warehouse renders it an inappropriate location for a mass detention facility.**

108.    The Surprise Warehouse's commercial listing identifies the property type as "Industrial."[25]  When it was built, its designers identified it as being suitable for "tenants in the ecommerce, manufacturing and semiconductor supply industries."[26]

109.    As identified above, the Surprise Warehouse sits directly across the street from the Chemical Warehouse.  The Chemical Warehouse includes "storage spaces ranging from refrigerated and freezer rooms to temperature-controlled zones for flammable and corrosive materials."[27]

110.    Typical chemicals used in the production of semiconductors include hydrofluoric acid, hydrochloric acid, sulfuric acid, ammonium fluoride, and flammable solvents (such as acetone).[28]

111.    Section 112(r) of the Clean Air Act requires facilities involved in the storage of hazardous substances to submit a Risk Management Plan (RMP).  *See* 42 U.S.C. § 7412(r)(7)(b)(ii).  Rinchem's RMP for the Chemical Warehouse was filed on January 1, 2026.[29]

---

[25] *See supra* n.14.

[26] *See Rockefeller Group Buys Surprise Industrial Project Site*, AZ BEX (Apr. 19, 2023),        https://azbex.com/planning-development/rockefeller-group-buys-surprise-industrial-project-site/ (last accessed Apr. 14, 2026).

[27] *See supra* n.15.

[28] *See* Int'l Sematech Mfg. Initiative, *Overview of the Semiconductor Industry and its Approach to Chemical Management and Environment, Safety, and Health* (Dec. 29, 2006), https://www.semiconductors.org/wp-content/uploads/2020/10/Overview-Of-The-Semi-Industry-And-Its-Approach-To-Chem-Mgmt-and-EHS.pdf (last accessed Apr. 14, 2026).

[29] *See* Nw. Valley Indivisible, *Federal Records Show Planned Surprise ICE Detention Center May Sit Inside a Chemical Hazard Zone* (Apr. 2, 2026), https://northwestvalleyindivisible.org/federal-records-show-planned-surprise-ice-detention-center-may-sit-inside-a-chemical-hazard-zone (last accessed Apr. 14, 2026).

23

112.    Upon information and belief, the RMP does not consider the potential hazards incurred by the presence of a mass detention facility next door, nor does it contemplate risk mitigation measures responding to the same.

113.    To Plaintiff's knowledge, Defendants have conducted no risk assessment regarding the proximity of the Surprise Warehouse to the Chemical Warehouse, nor have they even acknowledged the proximity of the two locations in any public-facing communications.

114.    It is a matter of general public policy that chemical storage warehouses be located in non-residential areas to reduce the risks of residents' exposure to hazardous materials.  The same holds especially true when chemical storage warehouses are located near facilities—like the Surprise Warehouse—with large captive populations incapable of seeking safety in the event of an accident or explosion.

115.    Given that, it makes sense that the Chemical Warehouse and Surprise Warehouse are both located in an area zoned for "Business Park" or "Industrial" use, rather than residential or general commercial use.  *See* Exhibit J.

116.    The City of Surprise's Land Development Ordinance characterizes "Business Park" zones as those which provide "limited retail and service uses primarily to serve the business park uses"; "Light Industrial" zones as those which "provide[] for a mix of industrial activities which have generally negative impacts on the community, and which may be incompatible with other uses"; and "General Industrial" zones as those which "provide[] for a mix of industrial activities requiring large land areas unencumbered by nearby residential or commercial development."  *See* Surprise Municipal Code § 106-7.2.

117.    Of course, none of these uses encompass or envision the use of a given property for mass detention purposes.

24

## 2. The Surprise Warehouse will negatively impact local traffic systems in an area ill-suited for such expanded use.

118. Operating the Surprise Warehouse as a detention facility housing hundreds of detainees at a time and staffed by hundreds of ICE employees will increase local traffic burdens in an area currently zoned for "Business" and "Industrial" use.

119. Although Defendants have not provided any details regarding expected traffic impacts, conversion of the Surprise Warehouse will result in significantly increased traffic in the area from (1) the actual process of construction itself, which will involve extensive vehicular traffic and the movement of construction materials and equipment; (2) movement of detainees to and from the facility; (3) increased staff commuting to and from work at the facility; and (4) visits to the facility from friends, family, and legal counsel exercising their right to visit detainees.

120. ICE's own documents suggest there will be steady movement of detainees to and from the facility, as the average stay for detainees at its new "processing centers" is intended to be less than one week. *See* DRI White Paper at 1, 3.

121. Traffic impacts from staff commuting to and from the facility will be significant. Again, DHS expects to employ more than one thousand people during construction and hundreds of full-time staff at the Surprise Warehouse following its conversion.[30]

122. As an area zoned for "Business" and "Industrial" use, the location of the Surprise Warehouse likely lacks adequate traffic infrastructure to support this anticipated increase in traffic. For example, the turn onto Sweetwater Avenue from its major connecting artery—Dysart Avenue—does not have a traffic light, rendering it clearly inadequate to support the proposed influx of hundreds of construction workers and staff to the Surprise Warehouse each day.

---

[30] *See* Surprise Warehouse Economic Analysis.

25

123.    Further, to the extent that Defendants intend to attempt to work around the Surprise Warehouse's sewer capacity limitations by transporting water to the warehouse and sewage from the warehouse by truck, such actions would further exacerbate the already significant traffic impacts of operating the site as a mass detention facility.

### 3.    Construction and operation of the Surprise Warehouse in an inappropriate location will detrimentally impact public health and safety.

124.    Operating the Surprise Warehouse as a detention facility housing hundreds of detainees at a time is likely to create public health and safety concerns that will at best massively strain the City of Surprise's resources, and at worst exceed Surprise's capacity to manage and contain serious crises, requiring the State to expend its own limited resources.

125.    DHS's detention facilities have a long and documented track-record of poor public health conditions.[31]  This pattern of behavior is current and ongoing—including within the State of Arizona.[32]

126.    One independent research report of DHS detainee deaths found that DHS facilities "provided incomplete, inappropriate, or delayed treatment and medication," engaged in "flawed or delayed emergency response[s]," failed to "take basic precautions during the COVID-19 pandemic," and did not provide adequate "staff who are trained and licensed to ensure patient health and safety."[33]

---

[31] *See, e.g.*, Office of the Inspector Gen., U.S. Dep't of Homeland Sec., OIG-24-59, *Summary of Unannounced Inspections of ICE Facilities Conducted in Fiscal Years 2020-2023* at 10 (Sept. 24, 2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-09/OIG-24-59-Sep24.pdf (last accessed Apr. 14, 2026).

[32] *See* Danielle Miller, *Arizona Democrats call Mesa ICE facility conditions 'shameful' after surprise visit*, FOX 10 Phoenix (Apr. 10, 2026), https://www.fox10phoenix.com/news/arizona-democrats-call-mesa-ice-facility-conditions-shameful-after-surprise-visit (last accessed Apr. 14, 2026).

[33] ACLU, Am. Oversight & Physicians for Hum. Rts., *Deadly Failures: Preventable Deaths in U.S. Immigration Detention* at 8–10, 37, 41–44, 48 (June 21, 2024), https://www.aclu.org/publications/deadly-failures-preventable-deaths-in-us-immigrant-detention (last accessed Apr. 14, 2026).

127.    As a result of DHS's public health failings, DHS detention facilities are vectors for spreading disease.  For example, in January 2026, the country's largest detention center experienced a major measles outbreak, reflecting how ill-equipped DHS facilities are to contain the spread of deadly and highly contagious pathogens.[34]

128.    Given this potential for major disease outbreak, in combination with other public health risk factors, the planned facility could cause one or more public health emergencies.

129.    These issues are exacerbated by the Surprise Warehouse's proximity to the Chemical Warehouse.  Upon information and belief, the City of Surprise is not capable of providing adequate mitigation and rescue services in the event of a spill or explosion impacting a captive population of hundreds of people.  Were such an event to occur, the State would likely be required to mitigate the damage.

130.    Further, operation of the facility as a mass detention center may result in traffic back-ups, delayed commute times, and associated delays in how quickly emergency response personnel can respond to other local hazards or medical emergencies.

131.    These issues are particularly salient given the Surprise Warehouse's proximity to two public schools.

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of the Administrative Procedure Act**
**Agency Action Contrary to Law (NEPA, 42 U.S.C. § 4321 et seq.)**

132.    The State incorporates by reference all preceding allegations.

133.    Under the APA, a Court must "hold unlawful and set aside agency action"

---

[34] *See* Nicole Acevedo, *ICE confirms a measles outbreak in the nation's largest detention facility in Texas*, NBC News (Mar. 4, 2026), https://www.nbcnews.com/news/us-news/ice-confirms-measles-outbreak-nations-largest-detention-facility-texas-rcna261659 (last accessed Apr. 14, 2026).

27

that is "not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Defendants' failure to comply with NEPA is both.

134. NEPA claims are subject to judicial review under the APA. *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005).

135. Defendants' decision to purchase, renovate, and operate the Surprise Warehouse as a mass detention facility is final agency action reviewable under the APA. Final agency actions are those which mark the consummation of the agency's decision-making process and are ones from which legal rights or consequences will flow. *See Bennett*, 520 U.S. at 177–78.

136. Defendants have completed the decision-making process: they have purchased the Surprise Warehouse expressly for the purpose of converting it to and using it as a detention facility and they have contracted with GardaWorld to conduct the desired retrofitting operations. Defendants' actions triggered their obligations under NEPA, the INA, and the APA.

137. The decision to purchase, construct, and operate the Surprise Warehouse is a "major Federal action[]" with impacts on the human environment that must be evaluated under NEPA. 42 U.S.C. § 4332(C).

138. NEPA makes clear what is required for such actions to proceed: preparation of an EIS or EA, or invocation of an applicable categorical exclusion.

139. Under NEPA, these requirements must be met *before* any major federal action is taken. *See Ctr. for Biological Diversity*, 141 F.4th at 993.

140. Defendants have completely disregarded these statutory requirements. Despite the scale, novelty, and certain environmental impacts of the Surprise Warehouse conversion, Defendants have produced no EIS, EA, or FONSI. Defendants have invoked no categorical exclusion excusing their failure to do so, nor is there any such applicable categorical exclusion. And since purchasing the facility, Defendants have continued to largely stonewall relevant stakeholders, including numerous members of Arizona's congressional delegation.

28

141.    Failure to conduct and publish the results of the required environmental review under NEPA deprives the State, the City of Surprise, other local governments, and the public of the procedure to which they are entitled by law.  Defendants' actions are thus directly at odds with NEPA's mandate that "environmental concerns be integrated into the very process of agency decision-making." *Andrus*, 442 U.S. at 350.

142.    The Court should enjoin Defendants from operating the Surprise Warehouse as a mass detention center and enjoin Defendants from conducting any future physical modifications or construction at the site to accomplish such purposes.

## COUNT II

### Violation of the Administrative Procedure Act
### Agency Action Contrary to Law (INA, 8 U.S.C. § 1231(g)(1))

143.    The State incorporates by reference all preceding allegations.

144.    By deciding to establish a mass detention facility in the Surprise Warehouse location, ICE has "arrange[d] for . . . [a] place[] of detention for aliens detained pending removal or a decision on removal"—but has failed to arrange for one that is "appropriate." 8 U.S.C. § 1231(g)(1).

145.    While the INA does not define what constitutes an "appropriate place[] of detention," the plain meaning of "appropriate" requires that the selected site be "suitable or compatible" for the intended use. *Appropriate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/appropriate (last accessed Apr. 1, 2026).

146.    The Surprise Warehouse is not an "appropriate" place for the mass detention purposes envisioned by Defendants because the facility itself cannot be appropriately used for the purposes envisioned by Defendants.

147.    The Surprise Warehouse does not currently possess the water or sewer infrastructure to accommodate hundreds of human occupants—detainees; attendant ICE personnel; and visitors.

29

148. As to water, the inevitably increased volume of use will likely reduce pressure and reliability for other users, impair fire flows, and alter groundwater flow in ways that degrade water quality and stream baseflow.

149. A facility without adequate sewer or water infrastructure to accommodate the intended number of occupants is plainly an "inappropriate" location for such intended occupancy.

150. ICE's own National Detention Standards confirm as much. They require that facilities "ensure appropriate temperatures, air and water quality, . . . and detainee living space, in accordance with any applicable state and local jail/prison standards." *See* ICE National Detention Standards at 7.

151. The Surprise Warehouse is also in an inappropriate location. Siting the Surprise Warehouse in a business and industrial zone across from a chemical warehouse presents obvious risks to detainee wellbeing and safety that the City of Surprise is ill-equipped to address. In the event of any mass-casualty or spillage incident, the State would thus need to expend resources in order to contain the potential fallout and damage.

152. Defendants' decision to purchase, renovate, and operate the Surprise Warehouse as a mass detention facility thus violated 8 U.S.C. § 1231(g)(1)'s mandate to select an "appropriate" location and was contrary to law.

153. The Court should enjoin Defendants from operating the Surprise Warehouse as a mass detention center and enjoin Defendants from conducting any future physical modifications or construction at the site to accomplish such purposes.

### COUNT III

**Violation of the Administrative Procedure Act
Agency Action Contrary to Law (INA, 8 U.S.C. § 1231(g)(2))**

154. The State incorporates by reference all preceding allegations.

155. The INA requires that prior to constructing a new detention facility, DHS consider "the availability for purchase or lease of any existing *prison, jail, detention*

*center, or other comparable facility* suitable for such use." 8 U.S.C. § 1231(g)(2) (emphasis added).

156. As DHS identifies, it considered four alternative properties before deciding on the Surprise Warehouse: 15784 W. Hatcher Road in Waddell, Arizona; 13543 W. Northern Avenue in Glendale, Arizona; 16500 W. Glendale Avenue in Litchfield Park, Arizona; and 8016 E. Pecos Road in Mesa, Arizona. *See* Floodplain Notice (Ex. C).

157. All of these facilities are—like the Surprise Warehouse—industrial warehouses. None are "prison[s], jail[s], detention center[s] or other comparable facilit[ies]." And Defendants have made no representations that they considered facilities that fall within the scope of the controlling provision.

158. Defendants' selection of the Surprise Warehouse without abiding by the statutory procedures mandated by the INA was accordingly contrary to the requirements of 8 U.S.C. § 1231(g)(2).

159. The Court should enjoin Defendants from operating the Surprise Warehouse as a mass detention center and enjoin Defendants from conducting any future physical modifications and construction at the site to accomplish such purposes.

**COUNT IV**

**Violation of the Administrative Procedure Act
Arbitrary and Capricious Agency Action (5 U.S.C. § 706)**

160. The State incorporates by reference all preceding allegations.

161. In addition to being contrary to law, Defendants' decision to move forward with the Surprise Warehouse is arbitrary and capricious—and thus forbidden by the APA. *See* 5 U.S.C. § 706(2)(A).

162. Defendants have not offered "a satisfactory explanation for [their] action" in selecting the Surprise Warehouse, an industrial warehouse which is patently unsuitable for human detention, nor articulated "a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

31

163.    And Defendants have given no explanation—let alone a reasoned one—for their refusal to comply with NEPA, a decision at odds with their previous position and practice that NEPA review is required for the purchase, construction, renovation, and operation of immigration detention and processing centers.

164.    The Court should enjoin Defendants from operating the Surprise Warehouse as a mass detention center and enjoin Defendants from conducting any future physical modifications and construction at the site to accomplish such purposes.

**REQUEST FOR RELIEF**

WHEREFORE, the State requests that this Court:

i.    Declare that Defendants' decision to establish a mass detention facility in the Surprise Warehouse without first preparing an environmental assessment or environmental impact statement is not in accordance with the law and without observance of procedure required by law, and therefore violates the APA;

ii.    Declare that Defendants' decision to establish a mass detention facility in the Surprise Warehouse, an inappropriate place for such detention, is not in accordance with the law, and therefore violates the APA;

iii.    Declare that Defendants' decision to establish a mass detention facility in the Surprise Warehouse without considering suitable alternatives is not in accordance with law, and therefore violates the APA;

iv.    Vacate and set aside Defendants' decision to establish a mass detention center at the Surprise Warehouse;

v.    Preliminarily and permanently restrain, enjoin, and stay Defendants from operating the Surprise Warehouse as a mass detention center and enjoin Defendants from conducting any future physical modifications and construction at the site to accomplish such purposes; and

vi.    Grant such other relief as this Court may deem proper.

RESPECTFULLY SUBMITTED this 24th day of April, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By  /s/ Joshua D. Bendor
    Joshua D. Bendor
    Nathan T. Arrowsmith
    Joshua A. Katz
    Office of the Arizona Attorney General
    2005 N. Central Avenue
    Phoenix, AZ 85004-1592

*Attorneys for Plaintiff State of Arizona*