# EXHIBIT D

**PAUL A. GOSAR, D.D.S.**
**NINTH DISTRICT, ARIZONA**

2057 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, D.C. 20515
(202) 225-2315

1300 SOUTH LITCHFIELD ROAD, SUITE 115-H
GOODYEAR, ARIZONA 85338
(623) 707-0530

**WWW.GOSAR.HOUSE.GOV**



**Congress of the United States**
**House of Representatives**
**Washington, DC 20515**

**COMMITTEE ON NATURAL RESOURCES**
SUBCOMMITTEES
CHAIRMAN, OVERSIGHT AND INVESTIGATIONS
ENERGY AND MINERAL RESOURCES

**COMMITTEE ON**
**OVERSIGHT AND GOVERNMENT REFROM**
SUBCOMMITTEES
HEALTH CARE AND FINANCIAL SERVICES
FEDERAL LAW ENFORCEMENT

February 4, 2026

The Honorable Kristi Noem
Secretary
U.S. Department of Homeland Security
300 7th St S.W.
Washington, D.C.

Dear Secretary Noem,

I write to you regarding recent reports that the Department of Homeland Security (DHS) is planning to convert a warehouse facility in Surprise, Arizona into a large-scale federal immigration detention center. As the Member of Congress representing Surprise and the surrounding communities, I have a responsibility to ensure that federal actions affecting my district are implemented transparently and in close coordination with state and local stakeholders.

Let me be clear at the outset: I strongly support the mission of U.S. Immigration and Customs Enforcement (ICE) and the enforcement of our nation's immigration laws. The rule of law is not optional, and detention capacity is an essential component of a functioning immigration system—particularly after years of reckless and deliberate policy failures by the Biden administration. Its open-border agenda allowed millions of illegal aliens to flood into the United States, including Arizona, overwhelming federal and local resources, straining public safety, and forcing the federal government into reactive, large-scale detention measures that could have been avoided with responsible leadership.

By contrast, the Trump Administration has demonstrated that decisive action, clear enforcement priorities, and an unwavering commitment to the rule of law can secure the border and restore order to our immigration system. Through effective border security policies, robust interior enforcement, and meaningful cooperation with state and local partners, illegal crossings have declined dramatically, and federal resources have been responsibly managed. That record stands as clear evidence that border security is achievable when the law is enforced and political will exists.

At the same time, while immigration policy is set at the federal level, its impacts are felt most acutely at the local level. A detention facility of the reported size raises legitimate and reasonable questions for nearby residents, schools, first responders, and local governments. Concerns regarding infrastructure capacity, traffic, emergency services, environmental impacts, and public safety deserve serious consideration. These are not anti-illegal immigration concerns; they are common-sense expectations of transparency, planning, and accountability.

DHS has an obligation to work cooperatively with state and local officials—especially when making decisions that directly affect the day-to-day life of a growing city like Surprise. Even when detention capacity is necessary, it must be implemented responsibly, with appropriate review and open communication. Congressional oversight plays a critical role in strengthening public trust and ultimately supporting the lawful mission of immigration enforcement.

Accordingly, pursuant to my constitutional oversight responsibilities, I request that DHS provide written responses to the following questions no later than 10 business days from receipt of this letter:

1. What is the planned capacity of the proposed detention facility in Surprise, and what population (e.g., adult males, families, short-term detainees) is expected to be housed there?
2. What DHS components will operate the facility, and will operations be conducted directly by the federal government or through private contractors?
3. What consultations, if any, have occurred with the City of Surprise, Maricopa County, local school districts, and public safety agencies prior to site selection?
4. What traffic impact analyses have been conducted, and what mitigation measures are planned to address increased vehicular traffic in surrounding neighborhoods?
5. How does DHS plan to ensure adequate access to emergency medical services, fire protection, and law enforcement support without straining existing local resources?
6. What security measures will be in place to ensure the safety of nearby residents, schools, and businesses?
7. What infrastructure upgrades (roads, utilities, communications) will be required, and who will bear the associated costs?
8. What is the anticipated timeline for site development, operational commencement, and any future expansion?
9. How does DHS plan to maintain ongoing communication with local officials and residents, and what mechanisms will be in place to address community concerns once the facility is operational?
10. Is the proposed detention facility intended to operate on a temporary or permanent basis? If temporary, what is the expected duration of operations, and what specific benchmarks or conditions will determine closure or decommissioning of the site?
11. What contingency plans does DHS have in place should detention numbers exceed the facility's planned capacity, and would such contingencies involve expansion of this site or the use of additional facilities in or near Surprise?
12. Will detainees be transported to and from the facility by federal personnel, contractors, or local law enforcement, and what coordination agreements—if any—are being contemplated with local agencies?
13. What funding sources are being used for the acquisition, conversion, and operation of the facility, and has DHS assessed whether future appropriations shortfalls could shift costs or operational burdens onto state or local governments?
14. What role, if any, does DHS envision for congressional oversight committees in reviewing compliance, operational standards, and community impact once the facility becomes operational?
15. Going forward, what formal process does DHS intend to use to communicate regularly with Members of Congress and state and local officials regarding the facility's status, operations, and any material changes to its scope or mission?

I appreciate your prompt attention to these matters. My goal is to ensure that federal immigration enforcement is carried out effectively while respecting the legitimate interests of the communities that bear its local impacts. I look forward to your timely response and to continued cooperation in support of lawful, responsible immigration enforcement.

Sincerely,

Paul A. Gosar, D.D.S.
Member of Congress